**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**WILLIE JAMES YELDON, 97-B-1012,**

                                    **Plaintiff,**                    **07-CV-370(Sr)**

**v.**

**BRIAN Fischer, et al.,**

                                    **Defendants.**

---

**DECISION AND ORDER**

        Pursuant to 28 U.S.C. § 636(c), the parties have consented to the

assignment of this case to the undersigned to conduct all proceedings in this case,

including the entry of final judgment.  Dkt. #34.


        On June 11, 2007, plaintiff, appearing *pro se*, filed this action pursuant to

42 U.S.C. § 1983 alleging deliberate indifference to a serious medical need against

Brian Fischer, Commissioner of the New York State Department of Corrections

("DOCS"), Dr. Champagne and Dr. Taesoo Kim,[1] physicians at the Franklin Correctional

Facility ("Franklin"), Dr. DiRisio, a surgeon at the Albany Medical Center, Dr. Chen

George-Pai,[2] a surgeon at the Alice Hyde Medical Center, Dr. DePerio and Dr. Shiekh,

physicians at the Wyoming Correctional Facility ("Wyoming"), Tom Edwards, a

---

        [1] Dr. Taesoo Kim was never served and has not answered or appeared in this action.
Dkt. #66, ¶ 4.

        [2] Dr. Chen George-Pai was never served and has not answered or appeared in this
action.  Dkt. #66, ¶ 4.

Registered Physician's Assistant at Wyoming, and Dr. Downs, a surgeon at the

Wyoming County Community Hospital, alleging that during his incarceration, he

received inadequate medical treatment for his back pain.  Dkt. #1.


Currently before the Court are defendants' motions for summary

judgment.  Dkt. #58 & Dkt. #63.  For the following reasons, defendants' motions are

granted.


## BACKGROUND

Plaintiff has been in DOCS' custody since 1997 and was transferred to

Franklin on July 20, 2000.  Dkt. #66, ¶ 6.  Medical records at Franklin indicate that

plaintiff complained of back spasms upon his arrival and was prescribed ibuprofen and

given a lower bunk permit and back brace permit.  Dkt. #66, ¶ 10.  Medical records

indicate repeated evaluations by Dr. Champagne and the medical staff at Franklin,

physical therapy, and numerous referrals to outside specialists.  Champagne

Declaration, Exh. A.[3]  For example, plaintiff received a CT scan of his back at the Alice

Hyde Medical Center in October of 2001, which revealed a broad based left disc

herniation of moderately large degree.  Dkt. #66, ¶ 15.  Plaintiff was approved as

medically unemployed for the program committee in November of 2001.  Dkt. #66, ¶¶

17.

---

[3] The declaration of Dr. Champagne was not e-filed but was provided to the Court as part of a courtesy copy of the defendants' motion for summary judgment with a Certificate of Service indicating service upon plaintiff.

Shortly thereafter, plaintiff was transferred to the Coxsackie Correctional Facility Regional Medical Unit for a neurosurgical consult and recommendation for an MRI.  Dkt. #66, ¶ 18.  The MRI was conducted on November 12, 2001 and revealed "a large left posterolateral disc herniation compressing the nerve root as it courses within the left lateral recess" at L5-S1.  Champagne Declaration, Exh. A.  On January 10, 2002, Dr. Waldman, a neurosurgeon, diagnosed a large left post-lateral L5-S1 disc herniation compressing nerve root with signs of left lower extremity radiculopathy and recommended evaluation for a micro-discectomy as soon as possible.  Dkt. #66, ¶ 20.

Dr. DiRisio first examined plaintiff on March 21, 2002.  Dkt. #61, ¶ 2. After reviewing the results of an MRI indicating a herniated nucleus pulposus at L5-S1 level on the left side, Dr. DiRisio recommended surgery to relieve the compression on the nerve root.  Dkt. #61, ¶ 2.  On April 5, 2002, Dr. DiRisio performed a left sided lumbar laminoforamenotomy and discectomy at L5-S1 to decompress the S1 nerve root.  Dkt. #61, ¶ 3.  Plaintiff was discharged from the Albany Medical Center to the Coxsackie Regional Medical Unit on April 8, 2002.  Dkt. #59, ¶ 9.

Plaintiff was transferred to Franklin, where he received follow up care, including a follow up examination with a neurosurgeon.  Dkt. #66, ¶ 23.  Plaintiff reported that he did not feel that the surgery had resolved his back problem.  Dkt. #66, ¶ 23.  Plaintiff was prescribed physical therapy in May of 2002, but chose to discontinue on June 13, 2002.  Dkt. #66, ¶ 24.  An MRI on June 6, 2002 found

a previous left L5-S1 laminectomy.  Moderate loss of disc signal is noted at this level.  Epidural soft tissue is seen on

> the left lateral side at this location.  Following IV gadolinium
> administration, this area demonstrates enhancement
> indicating that it represents a scar.  No recurrent disc
> herniation is seen.

Champagne Declaration, Exh. A.  Plaintiff was examined by Dr. Emrich on August 1, 2002 and by Dr. Kim on September 10, 2002 for neurosurgery consults.  Dkt. #66, ¶¶ 26-27.  Upon review of an MRI, Dr. Kim observed a scar at L5-S1 but did not see a recurrent disc.  Dkt. #66, ¶ 27.  Dr. Kim recorded complaints of pain with no objective findings and suggested a pain management consultant.  Dkt. #66, ¶ 27.

On October 16, 2002, plaintiff was examined by Dr. Chen at the Alice Hyde Medical Center for a pain management consultation.  Dkt. #66, ¶ 29.  Dr. Chen reviewed the MRI from June of 2002 and observed a "possible scar in epidural space from L5 to S1."  Champagne Declaration, Exh. A.   Dr. Chen diagnosed failed back syndrome and gave plaintiff an epidural steroid injection, noting that scarring could prevent the medication from getting to the source of plaintiff's pain.  Dkt. #66, ¶ 29 & Champagne Declaration, Exh. A.  Plaintiff received a CT scan in December of 2002 and another epidural injection from Dr. Chen in February of 2003.  Dkt. #66, ¶¶ 31-32.   On February 19, 2003, Dr. Chen

> discussed with Mr. Yeldon that because of his scarring that
> medication may not be able to get to where it needs to be.
> We will try another injection just to be sure.  My personal
> recommendation if he does not get signification pain relief is
> that he should get epidural dye injection with probably Racz
> catheter for epidurolysis of adhesions.

Champagne Declaration, Exh. A.

Plaintiff transferred from Franklin to the Upstate Correctional Facility ("Upstate"), on March 28, 2003, and shortly thereafter was transferred to Wyoming. Champagne Declaration, ¶ 130 & Dkt. #66, ¶ 39.  Dr. Champagne did not treat plaintiff following this transfer.  Champagne Declaration, ¶ 131.

Plaintiff was seen by medical staff at Wyoming more than 200 times between and July 28, 2004 and July 13, 2007.  Shiekh Declaration, Exh. A.[4]  Dr. Shiekh examined plaintiff at Wyoming on August 2, 2004 and noted his complaints of low back pain.  Dkt. #66, ¶ 42.  Dr. DePerio first examined plaintiff at Wyoming on November 1, 2004, at which time it was noted he was awaiting a pain management consultation for low back pain.  DePerio Declaration, ¶ 11.[5]

Plaintiff was transferred to the Wende Correctional Facility Regional Medical Unit for a neurosurgery consult on November 30, 2004.  DePerio Declaration, ¶ 14.  Dr. DePerio referred plaintiff to Dr. Downs for an assessment in December, 2005.  DePerio Declaration, ¶ 15.  Dr. Downs opined that the MRI from June, 2004 "shows significant foraminal stenosis with scar tissue and recurrent disc" and noted

> Options include repeat decompressive laminectomy and foraminotomy.  His opinion was that he though[t] the

---

[4]  The declaration of Dr. Shiekh was not e-filed but was provided to the Court as part of a courtesy copy of the defendants' motion for summary judgment with a Certificate of Service indicating service upon plaintiff.

[5]  The declaration of Dr. DePerio was not e-filed but was provided to the Court as part of a courtesy copy of the defendants' motion for summary judgment with a Certificate of Service indicating service upon plaintiff.

surgeon who originally did the surgery may have not done
the right level, but from everything I see on the studies and
the clinical exam, that's not the case.  The problem all
seems to be around the S1 nerve root and so the plan would
be to do a foraminotomy.  The risk of continued pain from
the scar tissue and no improvement at all was discussed.
The risk of making things a lot worse was also discussed.
Living with it would be a strong recommendation, using pain
medication, although he doesn't feel he can do that and
wants to proceed with the surgical approach.  That is also a
medically reasonable option that we can proceed with if
determined by the correctional institution as appropriate in
this circumstance.

Downs Declaration, Exh. A.[6]


Dr. Downs performed a decompression laminectomy with excision of scar

tissue at L5-S1 at the Wyoming County Community Hospital on March 25, 2005.

Downs Declaration, ¶ 8.  Dr. Downs

discovered that there was extensive scar tissue with reactive
fibroma from the stretched injured S1 Nerve root with tight
foramen.  There was no evidence of disc herniation at that
level.  The disc space was narrowed and contents fibrotic
but there was no herniation or extrusion of the disc.

Downs Declaration, ¶ 10.  Dr. Downs' post-surgical diagnosis was "neural fibrosis,

neuroma, neuropaxia S1 nerve root, chronic."  Downs Declaration, ¶ 10.  During a

follow-up examination on April 20, 2005, Dr. Downs informed plaintiff

that during the surgery we found scar tissue along the S1
nerve root, so I suspected that he would have some
permanent leg pain.  I did feel that the surgery would heal
him a lot.

---

[6] The declaration of Dr. Downs was not e-filed but was provided to the Court as part of
a courtesy copy of the defendants' motion for summary judgment with a Certificate of Service
indicating service upon plaintiff.

Downs Declaration, ¶ 12.  Dr. Downs examined plaintiff again on May 31, 2005 and

July 27, 2005.  Downs Declaration, ¶¶ 13-14.


Plaintiff was examined by P.A. Tom Edwards on June 15, 2006 and

complained that his back pain was worse.  Dkt. #66, ¶ 54.  Dr. Coniglio examined

plaintiff at the Orthopedic Clinic at the Wyoming County Community Hospital on July

20, 2006, diagnosed him with post laminectomy failure and opined that plaintiff would

need revision surgery.  Sheikh Declaration, Exh. A.  Dr. Coniglio performed a lumbar

myelogram on September 5, 2006 which revealed "mild central spinal stenosis at L3-L4

and L4-L5.  Sheikh Declaration, Exh. A.  A CT Scan conducted the same day revealed

a "mild diffuse posterior disc bulge at L4-L5" and at L5-S1,

> vacuum phenomenon consistent with disc degeneration.
> There is a small left posterior disc protrusion at this level.
> This slightly displaces the left S1 nerve root sleeve within the
> left lateral recess of the spinal canal.

Sheikh Declaration, Exh. A.


Brian Fischer became Commissioner of DOCS on January 1, 2007 and

declares that he has had no personal involvement in any of the matters about which

plaintiff complains and does not directly supervise the provision of medical services

within DOCS.  Dkt. #67.


Following a January 11, 2007 examination, Dr. Coniglio proposed a L5-S1

discectomy.  Sheikh Declaration, Exh. A.  On April 6, 2007, Dr. Coniglio "revised two

-7-

previous failed lumbrosacral spine L5-S1 micro-discectomies; external neurolysis of the

left S1 nerve root, previous complete discectomy at L5-S1disc; medial facetectomy and

foraminotomy at L4-5 along with left sided laminotomy at L5-S1."  Sheikh Declaration,

Exh. A.  Plaintiff reported significant improvement following the April 6, 2007 surgery.


Plaintiff was transferred to the Attica Correctional Facility on July 13,

2007.  Shiekh Declaration, ¶ 137.


## DISCUSSION

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party seeking to defeat a motion for summary judgment,

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## Statute of Limitations

"The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law."  *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009).  Accrual of claims is governed by federal law, which provides that a "Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm."  *Id.*  As plaintiff filed the instant case on June 11, 2007, any claims which accrued prior to June 11, 2004 are time barred.  As of June 11, 2004, plaintiff had clearly expressed his dissatisfaction with the results of Dr. DiRisio's April 5, 2002

surgery and Dr. Chen's epidural steroid injections and had continued to complain of back pain to medical personnel at the Franklin Correctional Facility until his transfer to Wyoming on March 28, 2003, at which time Franklin medical personnel ceased their treatment of plaintiff.  As a result, plaintiff's claims against Dr. DiRisio, Dr. Chen, Dr. Champagne and Dr. Taesoo Kim are barred by the statute of limitations.

**Eighth Amendment Claim**

In his complaint, plaintiff argues that DOCS medical personnel failed to appropriately tend to his medical needs and failed to refer plaintiff to specialists in a timely fashion and that the surgeons to whom he was initially referred failed to completely remove his herniated L5 disc.  Dkt. #1.  In opposition to the motion for summary judgment, plaintiff argues Dr. DiRisio should have removed the L4-L5 disc from plaintiff's lower back during surgery but did not do so and that Dr. DiRisio should not have allowed his resident to perform the surgery.  Dkt. #72.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  To state a claim of deliberate indifference to a serious medical need, plaintiff must demonstrate that, as an objective matter, he suffered from a sufficiently serious medical condition.  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).   A medical need is serious if it presents a condition of urgency that may result in degeneration or extreme pain.  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  In making this assessment, courts consider

whether a reasonable medical doctor would find the condition important and worthy of comment or treatment; the impact the condition has on activities of daily living; and the existence of chronic and substantial pain.  *Id.*

Where the claim is that the care provided was inadequate, plaintiff must demonstrate that, as an objective matter, the alleged deprivation of adequate medical care was sufficiently serious, *i.e.*, that he "was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  In making this determination, courts assess whether the inadequacy in medical care is sufficiently serious, *i.e.*, "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Id.* at 280.

Plaintiff must also demonstrate that, as a subjective matter, each defendant acted with a subjectively culpable state of mind.  *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir. 2003).  In other words, each defendant must disregard an excessive risk to inmate health or safety of which he is aware.  *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002).  The defendant's actions must go beyond mere negligence or medical malpractice and demonstrate a reckless disregard for the risk presented.  *Farmer*, 511 U.S. at 835.  Moreover,

> It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.

*Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

-11-

Although the claims with respect to Franklin are barred by the statute of limitations, it is clear that plaintiff received adequate medical care during his incarceration at both Franklin and Wyoming.  Plaintiff was routinely seen by medical staff, afforded bottom bunking, excused from physical activity and declared medically unemployed, prescribed physical therapy, referred to outside specialists, including pain management specialists and neurosurgeons, and received multiple CT scans, MRIs, epidural steroid injections and surgical interventions.  Plaintiff's complaints that the initial surgical intervention was too conservative does not rise to the level of a constitutional claim.  The outside specialists exercised their professional judgment as to the appropriate care for plaintiff's complaints and DOCS' medical personnel facilitated care in accordance with those recommendations.


**Personal Involvement**

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006), *quoting Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see Iqbal*, 129 S.Ct. at 1937 ("In a § 1983 suit . . . each Government official . . . is only liable for his or her own misconduct.").  As Brian Fischer's declares that he had no personal involvement in plaintiff's medical care, and there is no evidence in the record to suggest otherwise, Brian Fischer is entitled to summary judgment on the alternate ground of lack of personal involvement.

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted.  The Clerk of the Court is directed to enter judgment in favor of defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

**DATED:**    **Buffalo, New York**
          **March 31, 2011**

                         **s/ H. Kenneth Schroeder, Jr.**
                         **H. KENNETH SCHROEDER, JR.**
                         **United States Magistrate Judge**